**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **MARQUIS SAED ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 24 C 50190** |
| **v.** | ) | |
| | ) | **Hon. Rebecca R. Pallmeyer** |
| **ANDREA TACK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM ORDER

Plaintiff Marquis Saed Allen, formerly a prisoner in the custody of the Illinois Department of Corrections ("IDOC"), has brought this action under 42 U.S.C. § 1983 against officials at Dixon Correctional Center ("Dixon"). Plaintiff alleges that Defendants—the Warden, Andrea Tack, and Assistant Warden, Arthur Manzano—denied him access to group worship for several months from 2023 into 2025, in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. Defendants Tack and Manzano have moved for summary judgment [52], arguing they had insufficient personal involvement in the decision to cancel group worship, that the cancellations did not substantially burden Plaintiff's right to worship, and that the worship service cancellations were necessary to serve a legitimate penological interest. Plaintiff's complaint under RLUIPA is moot because he has been released from custody and the only relief available under RLUIPA is injunctive relief. But questions of fact remain as to whether the cancellation of Plaintiff's group worship violated his rights under the First Amendment, and the motion is denied as to that claim.

## LOCAL RULE COMPLIANCE

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The Rule directs the moving party to submit the motion, supporting memorandum of law, and statement of material facts accompanied by cited evidentiary material.

N.D. Ill. L.R. 56.1(a), (d). The opposing party must then submit a response to the moving party's motion and statement of facts, consisting of "numbered paragraphs corresponding to the numbered paragraphs in the [movant's] statement." N.D. Ill. L.R. 56.1(b), (e)(1). "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." N.D. Ill. L.R. 56.1(e)(2). Facts asserted by the moving party "may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3). The party opposing summary judgment may also submit a separate "statement of additional material facts," also consisting of "concise numbered paragraphs," "supported by citation to the specific evidentiary material." N.D. Ill. L.R. 56.1(b)(3); 56.1(d)(1), (2). The court will not consider unsupported factual assertions or speculation. *See Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 831 (7th Cir. 2026).

While Plaintiff is proceeding without an attorney in this case, he had the benefit of counsel for the purpose of responding to Defendants' motion for summary judgment.[1] The court nevertheless reviews his submissions leniently. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). The court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."). The court nevertheless remains mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

## FACTUAL BACKGROUND

At all times relevant to Plaintiff's claims, he was in IDOC custody and housed at Dixon. (DSOF [54] ¶ 1.) Defendants Tack and Manzano, the Warden and Assistant Warden,

[1] Plaintiff was assigned settlement assistance counsel in this case [38] and when settlement discussions failed, the court granted counsel leave to continue representing Plaintiff for the limited purpose of preparing his response to any motion for summary judgment filed by Defendants [46], [47].

respectively, were responsible for overseeing safety and security operations at Dixon. (*Id.* ¶¶ 3-5; Tack Decl. [54-2] ¶ 4.) Robert Thomas was the head Chaplain at Dixon. (*Id.* ¶ 6.) On September 19, 2025, Plaintiff was paroled and released from custody. (*Id.* ¶ 2.)

Plaintiff Marquis Allen is a practicing Christian. (Def. Resp. to PSAF [69] ¶ 2.) A critical component of Mr. Allen's religious practice includes regular attendance at communal religious services. (*Id.* ¶ 3.) Attending communal services allows Mr. Allen to (i) interact with others who share his beliefs, (ii) draw courage and inspiration from others' worship and belief, (iii) receive instruction and guidance through sermons, and (iv) actively participate in communal worship through group prayer, music, and song. (*Id.* ¶ 4.) Mr. Allen has attended group religious services at least once a week (and often more frequently) from the time he was a young child and continuing through his incarceration. (*Id.* ¶ 5.) He has also regularly played a musical instrument and sung in a church band. (*Id.*) While individual prayer is important to Mr. Allen's beliefs, he states that it is not a substitute or replacement for communal religious services. (*Id.* ¶ 6.)

While at Dixon, Mr. Allen frequently attended Christian Chapel (attended by approximately 50–60 people per week after the COVID-19 pandemic) and God Behind Bars (attended by approximately 15–20 people per week after the COVID-19 pandemic). (*Id.* ¶ 7.) Christian Chapel gave Mr. Allen the opportunity to participate in group worship, including by playing music, singing, and sharing in worship in community with others. Sermons at Christian Chapel also offered him religious instruction and guidance. (*Id.* ¶ 8.) God Behind Bars also afforded Mr. Allen the opportunity to participate in group worship and hear a sermon from a pastor or preacher. During God Behind Bars service, volunteers would visit the prison, engage with attendees in group prayer, and play a video of a religious service that had been recorded the previous week. (*Id.* ¶ 9.) Christian Chapel begins at 8:30 a.m. on Sundays. (DSOF [54] ¶ 12.) God Behind Bars is hosted on Thursdays. (*Id.* ¶ 14.) Chaplain Thomas supervised both programs (*id.* ¶¶ 13, 16), and both were conducted in Dixon's Building 118. (Def. Resp. PSAF [69], ¶ 12.) As described below, Plaintiff Allen contends that these programs were very frequently canceled.

Chaplain Thomas scheduled and supervised religious services and programs for all faiths at Dixon, including Christian, Muslim, Catholic, African Hebrew Israelite, Seventh Day Adventist, Santeria, and Jehovah's Witnesses. (DSOF [54] ¶ 7.) He created a monthly calendar of religious programming that required approval from Defendant Tack or, if she was unavailable, from Defendant Manzano. (*Id.* ¶¶ 8, 9.) Defendants Tack and Manzano did not have day-to-day contact with Chaplain Thomas, nor did they conduct or schedule religious services. (*Id.* ¶¶ 10, 11; Pl. Resp. [62] ¶¶ 10, 11.)

Chaplain Thomas had discretion to reschedule Christian Chapel for any reason, including a facility lockdown, closure of Building 118, or his own vacation or sick leave. (DSOF [54] ¶ 19.) He was not involved in scheduling or rescheduling the God Behind Bars events, as those were run by volunteers, but these programs were also occasionally canceled because of volunteer availability, facility lockdowns, closure of Building 118, or Chaplain Thomas's vacation or sick leave. (*Id.* ¶¶ 20, 21.) Defendants assert that if a Christian Chapel service could not be held on Sunday, Chaplain Thomas would reschedule it for the next day, but Plaintiff asserts that in practice, the rescheduled services were also often canceled. (*Id.* ¶¶ 22–24; Pl. Resp. [62] ¶¶ 22–24.) Defendants assert that if a Chapel service had not been conducted by Wednesday, Chaplain Thomas occasionally rescheduled it to coincide with the Thursday God Behind Bars program; when this happened, Plaintiff states, frequently both Christian Chapel and God Behind Bars would be canceled. (DSOF [54]. ¶ 25; Pl. Resp. [62] ¶ 25.) Chaplain Thomas is off work on Fridays and Saturdays, and religious services are not scheduled on those days. (DSOF [54] ¶ 26.)

From January 2024 through June 2025, Christian Chapel was canceled and not rescheduled during fifteen calendar weeks. (*Id.* ¶ 27 (undisputed)). Specifically, there was no Chrisian Chapel Service at Dixon during the weeks beginning on January 14, 2024; February 18, 2024; February 25, 2024; March 10, 2024; March 17, 2024; June 16, 2024; July 14, 2024; September 22, 2024; October 12, 2024; December 29, 2024; January 5, 2026; April 6, 2025; April

20, 2025; June 1, 2025; and June 8, 2025. (*Id.* ¶ 28.) Services were canceled for various reasons detailed below, including because of lockdowns.

During a Level 1, 2, or 3 lockdown at Dixon, activities are restricted. (*Id.* at ¶ 30.) During a Level 1 lockdown, Defendants assert, movement of individuals in custody is restricted to medical or mental health needs and all programs—including religious services—are canceled, but Plaintiff has offered evidence that other prison facilities remained open, including the commissary. (*Id.* ¶ 31; Pl. Resp. [62] ¶ 31.) During a Level 2 lockdown, Defendants assert that, depending on an inmate's security clearance, they may be entitled to limited movement, but religious services and programs may be canceled. (DSOF [54] ¶ 32.) Plaintiff alleges that "other areas and locations of the prison frequently remain[] open and available" during Level 2 lockdowns. (Pl. Resp. [62] ¶ 32.) During a Level 3 lockdown, religious services and programs may be canceled; Defendants assert that "limited approval, escorted-movement is permitted," but Plaintiff disputes this assertion, stating that some areas of the prison "frequently remain[] open and available." (DSOF [54] ¶ 33; Pl. Resp. [62] ¶ 33.) When any lockdown is authorized, Chaplain Thomas is notified and either cancels or reschedules religious services or programs. (DSOF [54] ¶ 39.)

Dixon houses up to 1,975 minimum, medium, and maximum-security individuals in custody, and operates Dixon's Special Treatment Center and Psychiatric Unit; the latter serves individuals with heightened mental health needs. (DSOF [54] ¶ 34.) The facility requires proper staffing to operate safely for the benefit of individuals in custody and correctional staff. (*Id.* ¶ 35.) Relatedly, Dixon has "essential security posts," which must be staffed at all times. (DSOF [54] ¶ 36; Pl. Resp. [69] ¶ 23.) When there are not enough correctional staff available to fill essential posts, either Tack or Manzano requests authorization for a Level 1 lockdown from IDOC Deputy Director Christine Bannon-Dortch. (DOSF [54] ¶ 37.) When correctional staff are available to fill essential posts, but insufficient staff are available to cover non-essential areas, Tack or Manzano can request authorization for a Level 2 or Level 3 lockdown from Bannon-Dortch. (*Id.* ¶ 38.) Building 118, which contains the chapel and law library and houses religious services at Dixon, is

not deemed an "essential post," but Plaintiff believes it should be. (Pl. Resp. [62] ¶¶ 37, 38; Allen Decl. [62-1] ¶ 27.)

The record shows the following circumstances prevented group worship on dates between December 2023 and May 2025:

- On Sunday, December 24, 2023 (Christmas Eve), Dixon was on a Level 1 lockdown due to staffing shortages and employee absences. (DSOF [54] ¶ 40.)

- On Monday, December 25, 2023 (Christmas Day, a federal and state holiday), Chaplain Thomas was off work, and there were no religious services or programs, nor any rescheduled programs on Friday, December 29, 2023, or Monday, January 1, 2024. (*Id.* ¶¶ 41–43.) Friday was Chaplain Thomas's scheduled day off, and Monday was a state holiday. (*Id.*)

- On Thursday, January 4, 2024, Dixon was on a Level 2 lockdown due to staffing shortages and employee absences. (*Id.* ¶ 44.) Defendants state that "[s]chools, yards, industries, and morning Residential Treatment Unit meetings" were canceled along with group worship, but Plaintiff asserts that "other areas and locations of the prison" aside from Building 188 "remained open and available." (Pl. Resp. [62] ¶ 44.)

- On Monday, January 8, 2024, Dixon was on a Level 2 lockdown due to staffing shortages and employee absences. (DSOF [54] ¶ 45.) Individuals in custody were not even escorted to the dietary hall for meals on that date. (*Id.*)

- On Thursday, January 11, 2024, Dixon was on a Level 1 lockdown due to a statewide tactical team operation. (*Id.* ¶ 46.)

- On Monday, January 15, 2024—Martin Luther King Day, a federal and state holiday—Chaplain Thomas was off work, and no religious services were held. (*Id.* ¶ 47.)

- On Thursday, January 18, 2024, Dixon was on a Level 2 lockdown due to staffing shortages and employee absences. (*Id.* ¶ 48.) While Defendants insist that schools, yards, and Residential Treatment Unit meetings were canceled, Plaintiff's recollection is that they remained open. (Pl. Resp. [62] ¶ 48.)

- On Thursday, January 25, 2024, Building 118 was closed due to staffing shortages. (DSOF [54] ¶ 49.) Plaintiff admits that Christian Chapel was rescheduled from Monday, January 29, 2024, to Tuesday, January 30, and that he attended. (Pl. Resp. [62] ¶ 50; Allen Dep. [54-1] at 93:7–21.)

- On Thursday, February 1, 2024, Dixon was on a Level 1 lockdown due to staffing shortages and employee absences. (DSOF [54], ¶ 51.) Plaintiff admitted that Christian Chapel was rescheduled from Monday, February 5, 2024, to Tuesday, February 6, and that he attended. (*Id.* ¶ 52; Allen Dep. [54-1] at 96:1–7.)

- On Thursday, February 8, 2024, Building 118 was closed due to staffing shortages. (DSOF [54] ¶ 53.)

- There were no religious services or programs held during the week of February 18 through 24, 2024. (*Id.* ¶ 54.)

- There were no religious services or programs held during the week of February 25 through March 1, 2024. (*Id.* ¶ 55.)

- On Thursday, January 2, 2025, Dixon was on a Level 1 lockdown due to staffing shortages and employee absences. (*Id.* ¶ 56.) Christian Chapel was not held from January 5, 2025, through January 9, 2025. (*Id.* ¶ 57.)

- On Sunday, January 12, 2025, Chaplain Thomas was on personal leave but scheduled a guest speaker to conduct a service on Monday, January 13, 2025, in lieu of Christian Chapel. (*Id.* ¶ 58.) The parties dispute whether the guest speaker service occurred. (*Id.* ¶ 59; Pl. Resp. [62] ¶ 59.)

- On Thursday, January 16, 2025, Dixon was on a Level 1 lockdown due to staffing shortages and call-offs. (DSOF [54] ¶ 60.)

- On Thursday, January 23, 2025, Dixon was on a Level 3 lockdown due to staffing shortages and employee absences. (*Id.* ¶ 61.) Schools, industries, yard, gym, and activities in Building 118 were canceled, but Plaintiff states that areas of the prison other than Building 118 remained open. (Pl. Resp. [62] ¶ 61.)

- On Thursday, January 30, 2025, Dixon was on a Level 1 lockdown due to staffing shortages and call-offs. (DSOF [54] ¶ 62.)

- On Thursday, February 6, 2025, Dixon was on a Level 3 lockdown due to staffing shortages and employee absences. (*Id.* ¶ 63.) Schools, industries, and activities in Building 118 were canceled (*id.*), but Plaintiff maintains that in-person visits, video visits, commissary and dayrooms all remained open and available to inmates. (Pl. Resp. [62] ¶ 63.)

- A Good Friday Christian service was scheduled for Friday, April 18, 2025. (*Id.* ¶ 64.) Defendants state that Chaplain Thomas came in on his day off to conduct the service, but Plaintiff alleges the service never took place. (Pl. Resp. [62] ¶ 64.) Also, on Friday, April 18, 2025, Dixon was on a Level 1 lockdown due to staffing shortages and employee absences. (DSOF [54] ¶ 65.)

- There was no Christian Chapel held from April 20 through April 26, 2025. (*Id.* ¶ 66.) Christian Chapel, originally scheduled for Sunday, April 27, 2025, was rescheduled to Monday, April 28, 2025, and then to Tuesday, April 29, 2025, on which date it was conducted. (*Id.* ¶ 67.)

- On Thursday, May 1, 2025, Dixon was on a Level 1 lockdown due to staffing shortages and employee absences. (*Id.* ¶ 68.)

The parties disagree as to how many total services were canceled and what the relevant time period is. They agree that Christian Chapel and God Behind Bars services were canceled

34 times between December 24, 2023, through May 1, 2025. (Def. Reply [67] at 6; *see* Allen Decl. ¶¶ 16, 22.) Plaintiff has testified, however, that services were canceled 13 additional times between June 1, 2025, and July 13, 2025, bringing the total number of cancellations to 47. (Pl. Resp. [62] ¶ 28; Allen Decl. ¶¶ 22–23.) Defendants object to the court's consideration of these additional cancellations. They note that Plaintiff did not supplement his response to include all 47 dates before the end of discovery, which closed on June 2, 2025; that he has not disclosed his "detailed records" of the cancellations to Defendants and instead relies on his own declaration; and that Plaintiff has characterized some services that had been rescheduled as "canceled." (Def. Reply [67] at 3–4.) Indeed, Plaintiff admitted he attended rescheduled services for two of the dates on his list—January 29, 2024, and February 5, 2024. Pl. Resp. [62] ¶¶ 50, 52; Allen Dep. [54-1] at 93:7–21, 96:1–7.) As for the additional 13 cancellations in June and July 2025, Defendants have failed to dispute at least some of those dates. (*See* Def. Resp. to PSAF [69] ¶ 30 (admitting cancellations on June 2, 9, 10, 13, and August 3.)) In their own statement of facts, Defendants assert that Christian Chapel was canceled and not rescheduled during the weeks of June 1–7, 2025, and June 8–14, 2025. (DSOF ¶ 82.) Given Defendants' admission of at last some cancellations occurring after May 2025, and their inability to rebut Plaintiff's declaration, the court considers all 47 cancellations for purposes of this ruling.

Plaintiff did not speak to Defendant Tack about religious service cancellations and admits that he does not know whether Defendant Tack received any letter from him regarding cancellation of religious services. (*Id.* ¶¶ 69, 70.) Plaintiff did, however, file three grievances (dated January 9, 2024, February 20, 2024, and February 26, 2024) detailing the repeated cancellation of religious services and programs that were reviewed by prison officials and signed off on by Tack. (Pl. Resp. [62] ¶¶ 69, 70.) Plaintiff did not personally speak to, write to, or otherwise notify Defendant Manzano about the cancellations of religious services, but he believes that his grievances, reviewed by prison staff including Tack, would have put Defendant Manzano on notice of the issue. (DSOF [54] ¶¶ 71–73; Pl. Resp. [62] ¶¶ 71–73.)

## ANALYSIS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of establishing that no material facts are in genuine dispute. *Nat'l Inst. Fam. & Life Advocs.*, 484 F.Supp.3d 596, 608–09 (N.D. Ill. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 217, 323 (1986)). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id.* at 609.

Defendants seek summary judgment on Plaintiff's First Amendment Free Exercise claim, making three arguments: (1) Defendants Tack and Manzano lacked personal involvement in the cancellation of Plaintiff's group worship services; (2) Plaintiff's religious practices were not substantially burdened by the cancellation of group worship during the relevant time period; and (3) there were valid penological interests justifying the cancellation of Plaintiff's group worship. (Def. Mem. MSJ [56] at 5–9.) Defendants also seek judgment on Plaintiff's claim under RLUIPA, arguing that because Plaintiff has been released from custody, he is not entitled to injunctive relief, which is the only remedy available under that statute. (*Id.* at 9.)

### I. Personal Involvement

To recover damages under 42 U.S.C. § 1983, a plaintiff must establish that a defendant was personally responsible for the alleged violation of a right. *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). There is no *respondeat superior*, or vicarious liability, under § 1983; rather, a plaintiff must show that the supervisory official violated the Constitution through his own conduct. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Defendants Tack and Manzano argue that they lacked sufficient personal involvement in the decisions to cancel Christian group worship sessions to face liability under § 1983, but there are disputes of fact on that issue. Chaplain Thomas was responsible for scheduling religious services and programs at Dixon, but the schedule was subject to the approval of either Tack, or, in her absence, Manzano. The record

also shows that Tack or Manzano were responsible for implementing any lockdown at Dixon, and that lockdowns were the major reason or that group worship sessions were canceled.

Additionally, while Plaintiff never spoke to Defendants Tack and Manzano about the canceled religious services, he filed three grievances in early 2024 detailing the repeated cancellation of religious services and programs. (Pl. Resp. to DSOF [62] ¶¶ 69, 70.) While he does not know whether Defendant Tack received the letters from him, states that Tack "signed off on" these grievances and that they were "reviewed by prison personnel," which Defendants admit. (*Id.*; Allen Decl. [62-1] ¶¶ 17–20; Resp. PSAF [69] ¶ 17.) Additionally, the service and program cancellations continued even after Plaintiff filed this lawsuit in May 2024, when Tack and Manzano would have likely been on notice of the issue. (*Id.* ¶ 22.)

A prison official, put on notice of a constitutional violation by a prisoner's communication, may be liable for the violation if he had responsibility for correcting the problem, had authority to correct it, or reasonably relied on someone else to do so. *See, e.g., Reed v. McBride*, 178 F.3d 849, 852, 854 (7th Cir. 1999); *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) ("[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition."). Accordingly, based on the record presented, the court cannot find that Defendants Tack and Manzano lacked personal involvement in the alleged First Amendment violation.

**II. Substantial Burden**

Defendants next argue that the cancellation of group worship services at Dixon did not substantially burden Plaintiff's religious practice. (Def. Mem. MSJ [67] at 2–4.) The First Amendment guarantees incarcerated individuals a reasonable opportunity to practice their religion, subject to limitations based on a facility's legitimate penological interests. *Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011); *Turner v. Safley*, 482 U.S. 78, 89–91 (1987). To

demonstrate a free exercise violation, a plaintiff must show that the defendants "personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016).

Plaintiff is a practicing Christian. He submitted a declaration stating that an important component of his religious beliefs and practice includes regular attendance at communal religious services as part of a group or community of believers. As previously described, Plaintiff has regularly attended group worship services since childhood and has regularly participated in these services by playing a musical instrument and singing. While individual prayer is important to his beliefs, Plaintiff stated that it cannot replace communal religious services. (Allen Decl. ¶¶ 5, 7, 8.) Moreover, both Chrisitan Chapel and God Behind Bars services—when they were not canceled—allowed Plaintiff to participate in group worship, group prayer, listen to a sermon, and seek religious instruction and guidance. (*Id.* ¶¶ 10, 12, 14.)

Defendants insist that there was no burden on Plaintiff's religious practices because as few as 11 services were canceled for reasons other than lockdowns. (MSJ Mem. [56] at 7.). Plaintiff insists that there were as many as 47 cancelled group worship services between December 2023 and May 2025, that "he was repeatedly informed that the[] cancellations were due to lockdowns," and that cancellations were an ongoing problem that continued even after he filed this suit. (Allen Decl. [62-1] ¶ 21–23.) As discussed above, Plaintiff asserts that lockdowns did not uniformly apply to all areas of the prison. While religious services were consistently canceled, he alleges that other areas, such as the commissary and video and in-person visits, were often staffed and not subject to the same kind of restrictions placed on Plaintiff's religious practices. (Pl. Resp. DSOF [62] ¶¶ 31–32, 61, 63.) "A government action substantially burdens religious exercise if it prevents or inhibits religiously motivated conduct or compels conduct contrary to religious beliefs." *Daly v. Davis*, No. 08-2046, 2009 WL 773880, at *2 (7th Cir. Mar. 25, 2009) (citing *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir. 2008)). Based on the record

submitted by the parties, the court finds that questions of fact remain as to whether Plaintiff's religious practices were substantially burdened.

**III. Legitimate Penological Interests**

Defendants also argue that the restrictions placed on Plaintiff's religious practices were reasonably related to a legitimate penological objective. (Def. Mem. MSJ [56] at 6–7); *Childs v. Webster*, 168 F.4th 1020, 1032 (7th Cir. 2026). Four factors govern the court's analysis concerning whether a restriction infringes on an inmate's First Amendment religious rights: whether (1) there is a valid and rational connection between the restriction and a legitimate governmental interest; (2) there are alternative means of exercising the right that remain open to the inmate; (3) accommodation of the right would have a significant impact on prison staff or other inmates; and (4) the restriction is reasonable in relation to alternative responses to the penological concerns. *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009); *Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

The Seventh Circuit has repeatedly recognized that safety and security are compelling government interests that might justify some limitations on religious observance. *See Maddox*, 655 F.3d at 719 ("[P]rison restrictions that infringe on an inmate's exercise of his religion are permissible if they are reasonably related to a legitimate penological objective, such as security and economic concerns."); *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003–04 (7th Cir. 2019) (recognizing inmate health and safety as a legitimate penological concerns). Defendants argue that safety and security were at issue in this case because the cancellations of religious services were largely due to staffing shortages and employee absences. But there is evidence that during lockdowns, when religious services in Building 118 were canceled repeatedly over the period between December 2023 and July 2025, other areas of the prison remained open, or at least with fewer restrictions, including commissary operations, as well as video and in-person visits. The record also shows that Defendants requested and implemented the lockdowns, and made determinations regarding staffing necessity, based on what services and programs they deemed

to be essential and non-essential. Defendants have not presented their reasons for deciding that certain activities were deemed essential while religious services were not. Without more information and an explanation for closing Building 118 while other areas remained open, the court is unable to determine that such decisions were rationally related to safety and security.

The court notes, further, that Defendants have not established that Plaintiff had adequate alternative means of practicing his religion. Defendants insist that Plaintiff could read his Bible, pray in his cell, and access a daily affirmation book that is related to his religious practice—but as Plaintiff has explained, group worship is fundamental to his faith. (Def. Mem. MSJ [56] at 8; Opp'n [61] at 5–6.) The discrepancies in the record regarding staffing, lockdowns, and different areas of Dixon remaining less restricted than others during lockdowns also implicates the third and fourth *Turner* factors: whether accommodation of the constitutional right would significantly impact other inmates or staff, and whether there were other reasonable alternatives available to Defendants.

Defendants are correct that the court should defer to the judgment of prison administrators regarding issues of safety and security in regulating religious activities, but the court is not required to do so blindly. *See Riker v. Lemmon*, 798 F.3d 546, 553 ("In order to warrant deference, prison officials must present credible evidence to support their stated penological goals . . . . The prison administration cannot avoid court scrutiny by reflexive, rote assertions." (internal quotation marks and citations omitted). Defendants argue that the "decision to determine which posts are essential . . . is squarely within the judgment of prison officials," but they do not state why they consider worship services to be "non-essential" and other posts to be "essential" for security. (Def. Reply [67] at 5.) The court is unwilling to defer to Defendants' judgment here without any statement of the reasons for their decisions. Defendants have not established that they are entitled to judgment as a matter of law.

## IV. RLUIPA

Plaintiff also raises a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. The statute prohibits the government from imposing "substantial burden[s] on the religious exercise" of state prisoners outside exceptional circumstances. 42 U.S.C. §§ 2000cc-1(a), (b)(1). The Seventh Circuit has held that when a *pro se* prisoner asserts a claim under the Free Exercise Clause, the district court should interpret that claim to include a statutory claim under RLUIPA. *Neely*, 912 F.3d at 1004. But Plaintiff is no longer housed at Dixon; he was released from state custody on parole on September 19, 2025. (DSOF [54] ¶ 2.) The only relief available under RLUIPA is declaratory and injunctive relief. *See Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1939, 1942 (2026) (holding that RLUIPA does not permit a cause of action against individuals for money damages); *see also Walker v. Baldwin*, 74 F.4th 878, 883–84 & n.1 (7th Cir. 2023) (noting that every federal circuit court to address the issue has held that RLUIPA does not authorize an award of money damages against state officials in their individual capacities); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) ("RLUIPA does not authorize any kind of relief against public employees").

Because Defendants have no ongoing authority over Plaintiff's worship activities, any claim for injunctive relief is moot. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996); *see also Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) ("When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers."). The court grants summary judgment to Defendants on Plaintiff's RLUIPA claim.

## CONCLUSION

The Defendants' motion [52] is granted with respect to RLUIPA but otherwise denied. A telephone status hearing is set for October 27, 2026 at 9:30 a.m. The parties should be prepared to discuss the next steps in the case, including the possibility of settlement or scheduling for trial.

ENTER:

Date: September 24, 2026

REBECCA R. PALLMEYER
United States District Judge